UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WILLIE WOODS | CIVIL ACTION |
| VERSUS | NO. 11-1928 |
| APACHE CORPORATION, ET AL. | SECTION "L"(2) |

**ORDER & REASONS**

Before the Court is Defendant Apache Corporation's Motion for Summary Judgment. (Rec. Doc. 46). The Court has reviewed the memoranda and applicable law, and it now issues this order.

I.  **UNCONTESTED FACTS**

On February 28, 2011, Plaintiff Willie Woods fell and was injured on a fixed oil and gas production platform owned by Defendant Apache Corporation. The platform was located on the outer continental shelf in the Gulf of Mexico. Woods alleges that the fall and injury occurred when he slipped or tripped on a step leading from a mobile living quarters facility and that the design or condition of the step was to blame. The facility had been leased from Defendant Stallion Offshore Quarters, Inc., a subsidiary of Stallion Oilfield Services, Ltd., (collectively, "Stallion").

At the time of the accident, much—if not all—of the work on the platform was being conducted by contractors retained by Apache. Woods, for instance, was a pump operator and lead hand employed by Tetra Applied Technologies, LLC, a subsidiary of Tetra Technologies, LLC, (collectively, "Tetra"), which Apache had hired to render various services, including plug

and abandon work on wells located at the platform.[1] Apache had also contracted with New Tech Engineering Corporation ("New Tech") to provide an "onsite operator representative" during the plug and abandon work. That position was filled by a New Tech subcontractor.

In his complaint, Woods alleges that "[o]n or about February 28, 2011, [he] experienced an accident when he fell outside of the [mobile] living quarters" and that fall was caused by "the slippery condition of the deck outside of the living quarters." (Rec. Doc. 1 at 2). Without citing any particular article of the Louisiana Civil Code, he alleges that the accident was caused by the negligent acts of Apache and Stallion Offshore, including:

> a) [B]reach of a legally imposed duty of reasonable care owed by the defendants to plaintiff;
> b) Negligently failing to properly maintain the area outside of the living quarters which caused Mr. Woods to fall;
> c) Failing to properly design and outfit the deck outside of the living quarters including, but not limited to, lack of non-skid and other slip prevention measurements;
> d) Failing to properly warn Mr. Woods regarding the dangerous condition as it existed outside of the living quarters;
> e) Violation of maritime law in regard to the premises outside of the living quarters; and
> f) All other acts of negligence which may be shown at the trial of this matter.

(*Id.* at 3).

## II.    PRESENT MOTION

Apache argues that "[u]nder the terms of [its contracts with Tetra, Stallion, and New Tech] neither Contractor(s) nor any Contractor Personnel were subject to the control or direction of Apache as to the details of the Work, Apache being interested only in the compliance of the Work with the job order." (Rec. Doc. 46-4 at 4). It further asserts that "it did not retain control

---

[1] According to the contract these services also included: electric wireline services, production well resting services, custom blended clear brine fluids and muds, on site fluid filtration, handling and recycling services, fluid engineering consultation, fluid management assistance, rental equipment, and well work-over services. (Rec. Doc. 46-3 at 35).

over the operative details, methods, or step by step processes employed by Tetra, New Tech, Telano, or Stallion . . . " and that those entities "retained the right to supervise their own work, and to provide the services described in the job or work order in their own way." (*Id*. at 5).

Woods responds that summary judgment should be denied because Apache is liable for any vice or defect in Stallion's mobile living quarters facility and also because Apache was independently negligent. (Rec. Doc. 55 at 1-2). First, Woods argues that, despite being owned by a contractor, the mobile living quarters facility was an appurtenance of Apache's fixed platform and that Apache had a nondelegable duty to remedy any hazard. (*Id*. at 4). He indicates that Apache acted negligently by disregarding its own safety manual, namely "by failing to carry out regular hazard control procedures and platform safety checks . . . ." (*Id*. at 5). Second, Woods argues that as the owner of the platform, Apache "owes a duty to independent contractors to provide a safe place to work." (*Id*. at 6). Specifically, Woods notes that "Apache authorized that this particular [mobile living quarters facility] model be placed on its platform and knew, or should have known, that this unit was not appropriate for use on its building." (*Id.* at 7).

In its reply, Apache notes that the law Woods relies upon, particularly the Louisiana Supreme Court's decision in *Olsen v. Shell Oil Co.*, "has undergone significant erosion" and is therefore inapplicable in this instance. (Rec. Doc. 70 at 1 (citing *Olsen*, 365 So.2d 1285 (La.1978)). (As previously noted, Woods has also asserted a separate theory of liability based on Apache's negligence distinct from *Olsen*, which negligence Apache denies.)

### III.  LAW & ANALYSIS
#### A.  Standard of Review

Summary judgment is appropriate if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). Furthermore, the nonmoving party "cannot avoid summary judgment . . . by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). In deciding a summary judgment motion, a court reviews the facts and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* at 725.

      B.      **Choice of Law**

"The Outer Continental Shelf Lands Act (OCSLA) mandates that when disputes arise involving fixed structures erected on the outer [c]ontinental [s]helf, applicable laws of the adjacent state will be applied to the extent not inconsistent with other federal laws and regulations." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 911 (5th Cir. 1997); *see* 43 U.S.C. § 1333(a)(2)(A). Because Apache's platform is located on the outer continental shelf adjacent to Louisiana, the law of Louisiana applies. Woods asserts two claims: one based on premises liability and one based on negligence. The Court will address each in turn.

### C. Premises Liability

#### 1. As Owner

Although Woods' complaint does not include any references to the Louisiana Civil Code, he relies on Article 2322 in his response. (Rec. Doc. 55 at 3 ("Louisiana law governs. [Article] 2322 is invoked when there is damaged [*sic*] caused by the vice, ruin or defect of a building.")).

Article 2322 provides:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. . . .

LA. CIV. CODE art. 2322 (1996).

The Louisiana Supreme Court and the Fifth Circuit have noted that Article 2322 creates liability where "(1) there is a building; (2) the building is owned by the defendant; and (3) there is a 'ruin,' caused by some vice in the building's construction or by a neglect to repair it, which occasions the injury." *Coulter*, 117 F.3d at 914 (citing *Olsen*, 365 So.2d at 1289). Such a defect or ruin may be "located in 'an appurtenance' to, or integral part of, the building, as well in the actual structure or materials of the building itself." *Id*. Prior to the 1996 revisions, satisfying these elements created a form of strict liability.[2] Now, Article 2322 only creates liability where the injured individual further proves that (4) the owner "knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage," (5) "the damage could

---

[2] "[I]n 1996 the Louisiana legislature adopted revised Article 2322, which limited the imposition of damages upon an owner of a building to instances when there is 'a showing that he knew, or in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.'" *Coulter*, 117 F.3d 909, 914 n.12 (5th Cir. 1997) (quoting LA. CIV. CODE art. 2322).

have been prevented by the exercise of reasonable care," and (6) the owner "failed to exercise such reasonable care." LA. CIV. CODE art. 2322 (1996).

Here, it is clear that the first and second elements of Article 2322 are met. First, a fixed offshore platform, such as the one at issue here, is considered a building for the purposes of Article 2322. *Coulter*, 117 F.3d at 914; *Olsen*, 365 So. 2d at 1290. Second, there is no disagreement that the platform itself is owned by Apache.

The crux of the dispute, however, revolves around the third element (that is, the nature of the ruin). As a preliminary matter, it is necessary to determine what, precisely, constituted the ruin. As noted above, a ruin may be "located in 'an appurtenance' to, or integral part of, the building, as well in the actual structure or materials of the building itself." *Coulter*, 117 F.3d at 914. Here, it is undisputed that Woods slipped on the step of Stallion's mobile living quarters facility, not the platform itself.[3] Thus, the alleged ruin involved the step. For Apache to be liable, Stallion's mobile living quarters facility and its step must have been an appurtenance of Apache's platform.

In its 1997 decision in *Coulter v. Texaco, Inc.*, the Fifth Circuit held "that Louisiana Civil Code Article 466 . . . provide[s] the sole framework within which to determine whether additions or equipment attached to a building can be considered a part of that building for purposes of assessing liability under Article 2322." *Id.* at 916. In doing so, that court reached a holding contrary to the Louisiana Supreme Court's decision in the factually similar *Olsen* case, which had

---

[3] During a deposition, Mr. Wilson stated: "I slipped. My feet—it slid forward and my heel caught the edge of that first step. The heel did and it slipped across it." (Rec. Doc. 46-3 at 19).

been decided prior to the enactment of Article 466.[4] At the time *Coulter* was decided, Article 466 provided:

> [1.] Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical, or other installations, are its component parts.
> [2.] Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.

LA. CIV. CODE art. 466 (1978). The *Coulter* decision noted that each paragraph of Article 466 provides a separate category of appurtenances, "the scope of which can each be defined in distinct terms." *Coulter*, 117 F.3d at 916. The first are appurtenances by virtue of their nature or function; the second are appurtenances solely based on the extent of their attachment to the building. *See id.*

With regard to the first paragraph, an object is considered an appurtenance if its nature or function is enumerated and if it meets the "ordinary societal expectations" or "*Equibank*" test. *See Equibank v. U.S. I.R.S.*, 749 F.2d 1176 (5th Cir. 1985). The test is self-explanatory: "Does the average, ordinary, prudent person buying a [building] expect the [object] to be there when he or she arrives to take possession?" *Id.* at 1180. In *Coulter*, the Fifth Circuit concluded "in light of the relevant 'societal expectations'—those of the offshore oil and gas drilling and production industry—[a drilling rig could not] be considered permanently attached to [a fixed] platform." *Coulter*, 117 F.3d at 918. It reasoned:

> [T]he average, ordinary, and prudent business entity that was buying or, alternatively, taking a security interest in, an offshore drilling platform would not expect, in the absence of specific contractual provisions to the contrary, an extremely costly drilling rig, one of the heaviest and most sophisticated pieces of industrial equipment in use currently, to be (1) perpetually attached to the

---

[4] In *Olsen* a mobile living quarters facility was considered an appurtenance; in *Coulter* a drilling rig was not.

>platform as a component part when the buyer took possession or (2) a permanent part of that platform when the lender obtained its security interest. To conclude otherwise would fly in the face of economic reality and long held contractual expectations of an entire industry.

*Id*. In reaching its conclusion with regard to the first paragraph of Article 466 in *Coulter*, the Fifth Circuit also rejected the suggestion that the drilling rig was connected to the platform's primary electrical system and that special expertise was required for its installation and removal. *Id.*

With regard to the second paragraph of Article 466, the "substantial damage" test is used. *Id.* at 917. This inquiry is "largely objective and fact bound." *Id.* In *Coulter*, the Fifth Circuit concluded that the drilling rig was just as incapable of being classified as an appurtenance under the substantial damage test of the second paragraph of Article 466 as it was under the first paragraph. *Id.* It acknowledged that "both the rig and the platform were modified in connection with the installation . . . and, upon removal, both will require repair and renovation to return them to their original conditions." *Id.* However, it reasoned that "[a]lthough the scope of these repairs and renovations to the platform and [rig] may well be 'substantial' on an absolute basis, they are certainly negligible relative to these [particular] structures." *Id*. Any damage resulting from removal would only be "a form of ordinary and entirely expected maintenance." *Id*.

However, the analysis in *Coulter* was based on the 1978 revision of the Louisiana Civil Code. *See id.* at 913 n.8. In 2008, Article 466 was revised to provide:

>[1.] Things that are attached to a building and that, according to prevailing usages, serve to complete a building of the same general type, without regard to its specific use, are its component parts. Component parts of this kind may include doors, shutters, gutters, and cabinetry, as well as plumbing, heating, cooling, electrical, and similar systems.

> [2.] Things that are attached to a construction other than a building and that serve its principal use are its component parts.
> [3.] Other things are component parts of a building or other construction if they are attached to such a degree that they cannot be removed without substantial damage to themselves or to the building or other construction.

LA. CIV. CODE art. 466 (2008). The 2008 revision comments indicate that the text "represents a fresh start in an area of law that has been the focus of extensive academic and jurisprudential debate" and that "[p]rior jurisprudence remains relevant only to the extent that it employs principles consistent with those provided under this Article." LA. CIV. CODE art 466 cmt. a (2008). The Court finds no precedent analyzing the revision in the present context.

Although the language of Article 466 has been altered significantly, the changes have not altered the analysis employed in *Coulter*. With regard to the new paragraph one, the text now codifies the judicially created ordinary societal expectations or *Equibank* test as a "prevailing usages" test. The new test appears to mimic the prior test by limiting the analysis to "buildings of the same general type" and ignoring any "specific use." LA. CIV. CODE art 466 (2008). Further, the language of the new first paragraph no longer requires that an object be "permanently attached," now it must only be "attached." This alteration is insubstantial because the extent to which something is physically attached (or the ease with which it could be unattached) is not relevant to the analysis under paragraph one.[5] Instead, the word "permanently" had referred to

---

[5] Interestingly, the old paragraph one pertained to both buildings and other constructions, but the new paragraph one pertains only to buildings—constructions are relegated to the new paragraph two. By incorporating the ordinary societal expectations or *Equibank* test into the new paragraph one, that test appears to have been necessarily divorced from the new paragraph two, which pertains only to constructions. Thus, the standards are now significantly different for buildings and constructions. The 2008 revision comments explain:
> In contrast to the test that applies to buildings in the first paragraph of this Article, the test applicable to other constructions in the second paragraph focuses upon the principal use of the construction. If the thing in question furthers that principal use, it is a component part of the construction, even though it can be removed without substantial damage to itself or to the construction. Thus, valves, piping and access ladders that are attached to a water

whether the object made the building complete, regardless of how well it was attached. With regard to the new paragraph three, "[t]he substantial damage test . . . —which applies to buildings and other constructions alike—is carried forward from the prior [paragraph two] without change in the law applicable to that test." LA. CIV. CODE art. 466 cmt. c (2008). Accordingly, the Court finds that the recent revisions to Article 466 have not changed its application under *Coulter*. Thus, the Court turns to the question of whether the facility here was an appurtenance, using *Coulter* as a guide.

Under the *Coulter* criterion, Stallion's mobile living quarters facility is not an appurtenance of the Apache platform under the prevailing usage test nor under the substantial damage test. With regard to the prevailing usage test, a mobile living quarters facility, like the drilling rig in *Coulter*, does not "serve to complete a building of the same general type." A fixed platform is not made more complete by the addition of such a facility. Nor would someone purchasing such a platform expect that the facility be included as an appurtenance. Whatever connections the facility may have had to the electrical, plumbing, or other services of the platform, it would simply not be considered an appurtenance to the platform under prevailing

---

tower, and in a somewhat more oblique sense lightning rods and beacon lights installed on the water tower to protect it, further its principal use and are consequently its component parts. On the other hand, a cellular telephone antenna which is bolted atop a water tower as a convenient point of elevation but which transmits radio signals having nothing to do with the operation of the water tower itself does not further the water tower's principal use and thus does not constitute its component part under the second paragraph of this Article.

LA. CIV. CODE art 466 cmt. g (2008).

It is worth noting that *Olsen*, upon which *Coulter* relies for the proposition that fixed platforms are buildings, provided only "that a permanent structure, such as [a] fixed drilling platform . . . which has a foundation in the soil, is indeed a building for purposes of [Article 2322]." *Olsen*, 365 So. 2d at 1290. It did not address the question of whether a fixed platform was a building for the purposes of 466 (nor would it have mattered because buildings and other constructions were treated identically in Article 466 prior to the 2008 revisions). In fact, *Olsen* qualifies its determination that a fixed platform is a building for the purposes of Article 2322 by indicating that "[i]n the context of the Louisiana Civil Code, a 'building' is a type of permanent construction that would be classified as an immovable." *Id*. However, absent a significant shift in precedent, this distinction is irrelevant to the present analysis because fixed platforms have been long considered buildings for the purposes of Article 2322, and by extension Article 466.

usage. With regard to the substantial damage test, the facility is also similar to the drilling rig in *Coulter* in that any alterations needed for its installation or removal would be nothing more than routine. In fact, its very description suggests its impermanent attachment to the platform. Following its removal from the Apache platform, it was transferred to yet another project. In essence, the Court finds that the reasoning employed in *Coulter* is equally applicable here. Accordingly, it is unnecessary to consider the remaining elements of Article 2322. Apache may not be held liable for any ruin of Stallion's step as its owner.

### 2.     As Custodian

Although Apache is not liable as an owner, it is also necessary to consider whether Apache is liable because it had custody of the mobile living quarters facility and, if so, whether that custody made it liable for the allegedly defective step. This analysis is governed by Article 2317, which provides:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. . . .

LA. CIV. CODE art. 2317 (1996).  Under Article 2317, liability exists if (1) "the thing causing damage was in the custody (or 'garde') of the defendant," (2) "had a vice or defect creating an unreasonable risk of harm,"  and (3) "the vice or defect occasioned damage." *Coulter*, 117 F.3d at 913.

Apache does not meet the first element. "Louisiana courts have generally held that (1) ownership of a thing establishes a rebuttable presumption of custody or 'garde,' and (2) in a case of non-ownership, a defendant may be found to have custody over property when he exercises direction and control of the thing and derives some benefit from it." *Id*. Here, as noted above, Apache does not own the Stallion facility nor can it be considered an appurtenance of the

-11-

platform it owns. Therefore, it is presumed that Stallion maintains custody. Absent evidence to the contrary, this presumption is unrebutted. There is no indication, in the contract or elsewhere, that either Apache or Stallion exercised direction or control over the facility after it had been affixed to the platform. It is just as likely that one maintained the facility as the other. Further, neither Apache nor Stallion had any representatives on the platform at the time of the incident and the benefit both received was financial in nature. Therefore, Apache did not have custody or garde over Stallion's mobile living quarters facility. It is unnecessary to consider the additional elements of Article 2317.[6] Having considered, and rejected, the contention that Apache was liable for Stallion's step by virtue of its ownership or custody, the Court now considers any liability Apache may have for its own negligence or that of its independent contractor, Stallion.

### D. Negligence

#### 1. Independent Contractor's Negligence

It is necessary to assess whether Apache is liable for Stallion's negligence in installing a mobile living quarters facility with an allegedly defective step. "Louisiana law provides the general rule that a principal is not liable for the negligent acts of an independent contractor acting pursuant to the contract." *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994); *Dupre v. Chevron U.S.A., Inc.*, 33 F.3d 7, 7 (5th Cir. 1994) ("We do not reject but fully accept the general principle that a platform principal owes no general duty to an independent contractor's

---

[6] Pursuant to Article 2317.1, the following elements would be imposed in addition to those included within Article 2317 itself:
> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care . . . .

LA. CIV. CODE art. 2317.1 (1996).

employees to correct a hazard on the platform which was created by the contractor."). "This general rule has two exceptions under which a principal may be liable when: (1) the suit arises out of the ultrahazardous activities of its independent contractor; or (2) the principal retains operational control over the independent contractor's acts or expressly or impliedly authorizes those acts." *Id.* Because the activities here are not considered ultrahazardous, the only issue is whether Apache retained control over or authorized any of Stallion's activities that resulted in Woods' injuries.

"Testing for this operational control exception first requires an examination of whether and to what extent the right to control work has been contractually reserved by the principal." *Coulter*, 117 F.3d at 912. Here, the contract between Stallion and Apache provides:

> 2. THE WORK.
> a) Company may, from time to time, request Contractor to perform work or render services hereunder ("Work") including but not limited to the following types of services: . . . Equipment Rental, Other Rental Equipment.
> b) Upon acceptance of a job order or other request to perform work, Contractor will commence the Work at the agreed upon time and continue to diligently perform the Work without delay in a safe, good and workmanlike manner in strict conformity with the specifications and requirements contained in the job order or other such request for Work.
> . . . .
> 7. INDEPENDENT CONTRACTOR. Contractor shall be and perform at all times as an independent contractor and neither Contractor nor any Contractor Personnel shall be deemed to be subject to the control or direction of Company as to the details of the Work, Company being interested only in the compliance of the Work with the job order. . . .

(Rec. Doc. 46-3 at 47). On July 28, 2010, Apache ordered a single "12 Man Sleeper" (that is, the the mobile living quarters facility), from Stallion. (Rec. Doc. 70-1 at 1-2).

Neither the documents memorializing the order of the facility nor Apache's contract with Stallion provide any indication that Apache had assessed the step or its safety. In fact, there is nothing to suggest that Apache knew anything more about the specifications of the facility when it ordered it than what was listed in the order itself (namely, that it was able to accommodate 12 individuals, its value, and the rental price). The order does not provide any further description of the facility, much less the built-in step or its condition. Apache merely ordered a mobile living quarters unit and expected that it be installed. As the contract provides, Apache was "interested only in the compliance of the Work with the job order." (Rec. Doc. 46-3 at 47).

Nor did Apache exert operational control by virtue of the fact that its operator representative had an opportunity to observe the step during the installation. "[T]he fact that a principal . . . reserves the right to monitor its contractor's performance and stations a 'company man' on the platform who observes the contractor's activities, has the right to make safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or conditions to his . . . superiors, does not mean that the principal controls the methods or details of the contractor's work." *Coulter*, 117 F.3d at 912. "[A]bsent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal . . . cannot be liable under the operational control exception." *Id.*

For example, in *Dupre v. Chevron U.S.A. Inc.*, another section of this Court rejected the contention that a platform owner had "affirmatively created [a] hazard" by allowing a drilling rig to be installed in such a way that a component projected over the perimeter of a platform. 913 F. Supp. 473, 478 (E.D. La. 1996). It reasoned:

> The evidence of [the owner's]'s actions and purposes in reviewing
> the installation plan [of the drilling rig] is simply not of the
> character to warrant a finding that it assumed a duty to be

> responsible for the safety of all of the component parts of [the independent contractor's] rig. . . . "It cannot be said that [the owner's] conduct in approving the installation plan created the hazard that caused plaintiff's death.

*Id.* at 479.

Here, there is no indication that Apache or its independent operator, himself an independent contract, had "either explicitly or implicitly authorized" the installation or "continued unsafe use"of the mobile living quarters facility or its allegedly defective step. *Coulter*, 117 F.3d at 912. The only thing Apache appears to have authorized was the rental of a "12 Man Sleeper."

### 2. Its Own Negligence

Next, it is also necessary to consider whether Apache is liable for its own negligence. "[E]ven though the general rule shields a principal from the acts of its independent contractor that do not fall within the above exceptions, the principal remains liable for its own acts of negligence." *Graham*, 21 F.3d at 645. "[T]he principal's duty [is defined] by reference to its contract with the independent contractor." *Id.* (citing *Crane v. Exxon Corp.*, 613 So.2d 214, 221 & n.7 (La. Ct. App. 1992)). Absent a contractual provision, "principal had no duty to provide a safe work place to the independent contractor's employees." *Id.* (citing *Crane*, 613 So.2d at 221 & n.7). Courts have noted that "even though a principal's representative 'arguably could have prevented [an] accident by injecting himself [into the unsafe situation], . . . he had no such duty to [the plaintiff], and is not liable for failing to do so.'" *Id.* at 647 (citing *Kent v. Gulf States Utils. Co.*, 418 So.2d 493, 500 (La.1982)) (alterations in original).

Here, the contract between Apache and Tetra does not create any independent duty to inspect the mobile living quarters facility nor its step. Neither did the contract require that Apache remedy the allegedly unsafe step, had it known about it. Where, as here, a "contract

. . . expressly states that [it] is the sole governing agreement," even safety guidelines or procedures will not impose a duty. *Id.* at 648. Accordingly, without any contractually created duty, Apache cannot be held independently negligent for the step either by ordering the mobile living quarters facility or by failing to notice its alleged defect.

## IV.   CONCLUSION

For the forgoing reasons, **IT IS ORDERED** that Defendant Apache Corporations' Motion for Summary Judgment (Rec. Doc. 46) is **GRANTED**.

New Orleans, Louisiana, this 17th day of October, 2013.

_____
UNITED STATES DISTRICT JUDGE